UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

———————————————————————

MARCUS KEITH MILLER,                                  Civil No. 04-2823 (ADM/SRN)

        Petitioner,

    v.                                                                  **REPORT AND RECOMMENDATION**

STATE OF MINNESOTA,

        Respondent.

———————————————————————

      Marcus Keith Miller, Minnesota Correctional Facility - Oak Park Heights, 5329 Osgood Avenue North, Stillwater, Minnesota, 55082-1117, Petitioner, pro se.

      Linda M. Freyer, Assistant Hennepin County Attorney, C-2000 Government Center, Minneapolis, Minnesota, 55487, for Respondent.

           ———————————————————————————

SUSAN RICHARD NELSON, United States Magistrate Judge

      This matter is before the undersigned Magistrate Judge of the District Court on the petition of Marcus Keith Miller for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed an answer, contending that the petition should be dismissed. The matter has been referred to this Court for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, the Court concludes that Petitioner's habeas corpus petition should be DENIED, and this action should be DISMISSED WITH PREJUDICE.

## I. BACKGROUND

      In 2002, a jury in the state district court for Hennepin County, Minnesota, found Petitioner guilty of first degree murder. He was sentenced to life in prison, and he is presently serving his sentence at the Minnesota Correctional Facility at Oak Park Heights.

Petitioner was convicted of killing a woman named Wendy Bozeman, whose body parts were found in a Minneapolis park on May 31, 2001. Shortly after midnight on that date, Bozeman told the man she was living with, Ronald Rucker, that she was going out. Rucker believed that Bozeman was going out in search of drugs. Approximately nineteen hours later, a woman discovered Bozeman's severed arm in Theodore Wirth Park. The police were called, and upon conducting a thorough search of the park, they found Bozeman's other arm, her legs, and her head. After the discovery of the body parts was announced in the paper, Rucker contacted the police and later confirmed the identity of Bozeman's remains.

During the search of the park, the police found a plastic garbage bag, which contained blood and human tissue, and also a parking lot ticket. The police also reviewed a videotape made by a surveillance camera in the park. The tape showed a man getting out of a Geo Tracker and depositing a garbage bag into a trash can.

Shortly after the newspapers reported the discovery of Bozeman's body, a man named Paul Melchert contacted the police, and informed them that he had been in Theodore Wirth Park on the day when Bozeman's body was discovered. He said that he had seen a light-skinned African American man standing near a turquoise car with a hatchback that was hinged on the left side and opened on the right. Melchert said that the tailgate had been open, and that he could see a garbage bag that he believed the man was intending to leave in the park.

Using the parking lot ticket found in the garbage bag that contained blood and human tissue, the police were able to determine that Petitioner owned a Geo Tracker that looked like the one seen in the park surveillance tape. The police then began to investigate whether

Petitioner was connected to Bozeman's death.

The police learned that Petitioner had not gone to work on the day of Bozeman's death. They also observed Petitioner leaving a garbage bag in front of a Salvation Army facility. The bag contained liquor bottles, women's jewelry, and some paper backing from some self-adhesive floor tiles. Watching Petitioner through a window at his home, the police saw him cleaning or scrubbing something.

When Petitioner learned that he was under surveillance, he voluntarily contacted the police and told them about his activities on the day that Bozeman died. He claimed that he was out drinking during the early morning hours of that day, that he got home around 2:00 or 2:30 a.m., and that he woke up with a hangover at about noon. He told the police that he then went to Theodore Wirth Park, where he ate an orange, and picked up some trash that he later put in a trash can.

Although Petitioner denied having any involvement in Bozeman's death, the police did not believe him, and placed him under arrest. After obtaining a search warrant, the police searched Petitioner's home and his Geo Tracker. In Petitioner's home, police investigators discovered a chlorine bleach smell emanating from the bathroom. They also found that a new shower curtain had been installed in the bathroom, and that the shower stall apparently had been damaged by a sharp instrument. Several other pieces of evidence were also found in Petitioner's home, including (a) some plastic bags that were similar to the one found in the garbage can at the park, (b) an article about human skeletons, (c) a plastic female head that appeared to be a sex toy, and (d) a list of Petitioner's sexual partners, which identified some of them as prostitutes.

Investigators from the Minnesota Bureau of Criminal Apprehension, ("BCA"), found blood under some bathroom floor tiles, which was subjected to DNA analysis. After the BCA agents left Petitioner's home, a Minneapolis Police Officer, Mike Carlson, found some additional blood spatters on a bathroom wall. The BCA agents were then called back to the home, so they could conduct a DNA analysis of that additional blood evidence. The blood found on the floor and wall of Petitioner's bathroom matched the victim's DNA. Blood evidence was also found in various places in Petitioner's Geo Tracker, and that blood also matched the victim's DNA.

The blood DNA evidence was, of course, tremendously important in this case. Petitioner's defense counsel attempted to keep that evidence from the jury by a motion in limine, but the trial court denied the motion and allowed the prosecution to present the DNA evidence at Petitioner's trial. That evidence showed that Bozeman's blood had been shed in Petitioner's home, and that her body (or body parts) had been transported in his car. The park surveillance videotape, (as well as Petitioner's own admission), showed that Petitioner was in the park shortly before Bozeman's remains were discovered there.

At the conclusion of the Petitioner's trial, the jury found him guilty of first degree murder after deliberating for just one afternoon. He was later sentenced to life in prison.

## II. PETITIONER'S DIRECT APPEAL

Following his conviction and sentence, Petitioner took a direct appeal to the Minnesota Supreme Court.[1] His appellate counsel filed a brief that presented two evidentiary arguments:

---

[1] Under Minnesota law, appeals in first degree murder cases are taken directly to the State Supreme Court, rather than the Court of Appeals. Minn.Stat. § 632.14.

(1) that the trial court had erroneously admitted the DNA evidence, and (2) that the trial court had erroneously admitted the evidence of the plastic female head and the list of sexual partners, which had been found in Petitioner's home.  Petitioner also filed his own pro se brief on direct appeal, which raised several claims of ineffective assistance of counsel at trial.

Superficially, Petitioner's pro se brief on direct appeal laid out his ineffective assistance of counsel claim in five separate subparts.  Upon closer inspection, however, it is clear that four of those five subparts are merely conclusory; i.e., they are not connected to any specific act or omission by his attorneys.[2]

The first subpart of Petitioner's ineffective assistance of counsel claim (on direct appeal) stated only that "counsel committed reversible error when it violated [Petitioner's] constitutional right to require witnesses to appear before the court for the purpose of offering testimony." Petitioner asserted that his attorneys neglected to call certain witnesses who purportedly could have offered helpful testimony, but he did not name any of the witnesses he had in mind, nor did he offer any hint as to how their testimony might have aided his defense.

In the second subpart of Petitioner's ineffective assistance of counsel claim, he stated that "counsel committed reversible error when it violated [Petitioner's] constitutional right to compulsory process to obtain witnesses in his favor."  Once again, however, he failed to identify any particular witness(es) that his attorney failed to call, and he failed to explain what he expected such witness(es) to say, or how they supposedly would have helped him.

In the third subpart of the claim, Petitioner contended that "counsel committed reversible

---

[2]  A copy of Petitioner's pro se brief on direct appeal is included in Respondent's return.  (Docket No. 10.)

error when it denied [Petitioner] the right to raise reasonable doubt as to his guilt by presenting evidence suggesting another person committed the crime."   To support this contention, Petitioner cited testimony that <u>was</u> introduced at his trial, which indicated that some of the evidence collected by police investigators, (fingerprints, palm prints, DNA samples, fibers and other substances), could not be clearly matched to either Petitioner or the victim.   Petitioner broadly asserted that his "counsel should have acted upon this [testimony regarding unmatched evidence] with the training and experience they possessed instead of concentrating on one thing [namely the matching DNA evidence]."   Again, he did not explain what, <u>specifically</u>, his attorney allegedly should have done.

The fifth subpart of Petitioner's ineffective assistance of counsel claim on direct appeal is also purely conclusory.   There, he claimed that "counsel committed reversible error" by violating his "constitutional right to a full defense."   He alleged that he should be granted a new trial "because of the previously mentioned violations," but he provided no clear explanation of what he meant by this claim.

Only the fourth subpart of Petitioner's ineffective assistance of counsel claim on direct appeal actually mentioned any specific alleged mistakes by his trial counsel.   In subpart four, Petitioner claimed that his attorney did not adequately cross-examine three prosecution witnesses:  (1) Paul Melchert, (the man who had seen a vehicle in the park that looked like Petitioner's), (2) Ronald Rucker, (the former boyfriend of the victim, who identified her remains), and (3) Sergeant Mike Carlson, (the police officer who discovered additional blood evidence in Petitioner's home after the BCA agents had left).   Petitioner argued that his attorney should have tried to impeach Melchert by showing that the tailgate on his Geo Tracker

is hinged on the right side, rather than the left side as Melchert had testified.  Petitioner also argued that his attorney should have challenged Rucker's testimony, by presenting evidence showing that Rucker had a criminal record, and had previously made verbal threats against the victim.  According to Petitioner, Rucker's testimony was not challenged because his attorney had previously represented Rucker, and he therefore had a "conflict of interest."  With regard to Sergeant Carlson, Petitioner argued that his attorneys "stopped short of asking him 'effective' questions" about how he had discovered the blood evidence in Petitioner's home after the BCA agents had completed their search.

The Minnesota Supreme Court rejected all of Petitioner's claims – those raised in his counsel's brief, (challenging the admissibility of the DNA evidence, and the evidence taken from Petitioner's home), as well as the ineffective assistance claims raised in Petitioner's own pro se brief.  State v. Miller, 666 N.W.2d 703 (Minn. 2003).  After the State Supreme Court upheld Petitioner's conviction and sentence on direct appeal, he filed his current habeas corpus petition.

## III.  PETITIONER'S CURRENT CLAIMS

There are six claims listed on the face of Petitioner's current habeas petition, but each one of those claims consists of only a single conclusory statement.  The petition itself provides no statement of relevant facts, no discussion of relevant legal principles, and no explanation of any of the listed claims, (even though the petition form that Petitioner used expressly directed him to include that information).  However, Petitioner later filed a supplemental document, anomalously entitled "Notice of Appeal," (Docket Nos. 14 and 15), which provides some (rather minimal) clarification of the grounds on which he is seeking federal habeas corpus relief.

It appears from Petitioner's "Notice of Appeal," that he is actually seeking relief based on six alleged mistakes by his trial counsel. Petitioner claims that he was deprived of his constitutional right to effective assistance of counsel because –

(1) his attorney failed to call three prospective witnesses, Tanish Bullock, Deanna Borske, and Victor Fields, who allegedly would have provided exculpatory evidence at Petitioner's trial;

(2) his attorney "failed to 1) call [an] expert to rebut blood, fingerprint evidence, and 2) call [an] expert to test potential exculpatory evidence;"

(3) his attorney failed to adequately cross-examine the following witnesses: (i) Sergeant Erika Christensen, (ii) Dana Blount, (iii) Paul Melchert, (iv) Sergeant Mike Carlson, (v) an unidentified law enforcement official who testified that he saw Petitioner scrubbing or cleaning something in his home, and (vi) Ronald Rucker;

(4) his attorney failed to suggest to the jury that someone other than Petitioner had killed the victim;

(5) his attorney failed to "present a full defense of the issues;" and

(6) his attorney had a "conflict of interest" resulting from the attorney's previous representation of Ronald Rucker.

For the reasons discussed below, the Court finds that Petitioner is not entitled to a writ of habeas corpus on any of these six claims. Most of Petitioner's current claims have been procedurally defaulted because they were not fairly presented to the Minnesota Supreme Court, and all of the remaining claims must be denied on the merits.

## IV.  PROCEDURALLY DEFAULTED CLAIMS

A.  Applicable Legal Rules

It is well established that a federal court may not entertain a petition for a writ of habeas corpus on behalf of a state prisoner unless the prisoner has first exhausted all available state court remedies for all of his claims.  28 U.S.C. § 2254(b); O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); Rose v. Lundy, 455 U.S. 509 (1982).  This exhaustion of state remedies requirement is based on the principles of comity and federalism; its purpose is to ensure that state courts are given the first opportunity to correct alleged federal constitutional errors raised by state prisoners.  O'Sullivan, 526 U.S. at 842; Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam); Rose v. Lundy, 455 U.S. at 518-19; Smittie v. Lockhart, 843 F.2d 295, 298 (8th Cir. 1988).

To exhaust his state court remedies, a prisoner must fairly present all of his constitutional claims to the highest state court to which such claims can be presented as a matter of right.  Duncan, 513 U.S. at 365-66.  See also McCall v. Benson, 114 F.3d 754, 757 (8th Cir. 1997) ("before we may reach the merits of a habeas petition, we must first determine whether the petitioner has fairly presented his federal constitutional claims to the state court").

The Eighth Circuit Court of Appeals has "held repeatedly that a claim has not been fairly presented to the state courts unless the same factual grounds and legal theories asserted in the prisoner's federal habeas petition have been properly raised in the prisoner's state court proceedings."  Krimmel v. Hopkins, 56 F.3d 873, 876 (8th Cir.), cert. denied, 516 U.S. 1015 (1995).  See also Jones v. Jerrison, 20 F.3d 849, 854 (8th Cir. 1994) (in order to "fairly present" a claim to the highest state court, "the petitioner must present the same facts and legal

9

theories to the state court that he later presents to the federal courts"); <u>Pollard v. Armontrout</u>, 16 F.3d 295, 297 (8th Cir. 1994) (to preserve a claim for federal habeas review, a state prisoner must "present the same legal theories and factual bases to the state courts").

If a prisoner has not exhausted his state court remedies with respect to some particular claim, by not fairly presenting the claim to the state's highest court, and if state procedural rules preclude any further attempts to satisfy the exhaustion requirement as to that claim, then the claim has been procedurally defaulted. <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991); <u>McCall</u>, 114 F.3d at 757. <u>See</u> <u>also</u> <u>O'Sullivan</u>, 526 U.S. at 848 (petitioner's failure to present his federal habeas claims to the state supreme court in a timely manner results in a procedural default of those claims).

A claim that has been procedurally defaulted will not be entertained in a federal habeas corpus proceeding, unless the petitioner has shown "cause and prejudice" to excuse his procedural default, or, in the alternative, that there would be a "fundamental miscarriage of justice" if the federal court declined to consider the claim. <u>Coleman</u>, 501 U.S. at 750. The "fundamental miscarriage of justice" exception is available only upon a "showing, based on <u>new evidence</u>, that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Brownlow v. Groose</u>, 66 F.3d 997, 999 (8th Cir. 1995), <u>cert</u>. <u>denied</u>, 516 U.S. 1161 (1996) (emphasis added), <u>quoting</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995). In other words, the petitioner cannot simply point to errors that allegedly occurred during the course of his criminal prosecution; he must instead offer some new evidence which

affirmatively demonstrates that he is, in fact, innocent of the crime for which he was convicted.[3]

The rules governing procedural default have been summarized by the Supreme Court

as follows:

> "In all cases in which a state prisoner has defaulted his federal claims in state
> court pursuant to an independent and adequate state procedural rule, federal
> habeas review of the claims is barred unless the prisoner can demonstrate
> cause for the default and actual prejudice as a result of the alleged violations of
> federal law, or demonstrate that failure to consider the claims will result in a
> fundamental miscarriage of justice".

Coleman, 501 U.S. at 750.

B. Petitioner's Procedurally Defaulted Claims

Most of Petitioner's current habeas corpus claims were not fairly presented to the

Minnesota Supreme Court in Petitioner's direct appeal.  Those claims have been procedurally

defaulted, and must be summarily dismissed.

---

[3]       "The actual innocence exception is concerned with claims of
actual, not legal innocence. Anderson v. United States, 25 F.3d
704, 707 (8th Cir. 1994).  It is evidence of factual innocence
coupled with a constitutional violation which triggers the actual
innocence exception.   Indeed, a credible claim of actual
innocence 'requires [a] petitioner to support his allegation of
constitutional error with new reliable evidence....' [Schlup, 513
U.S. at 324.]  Examples of evidence which may establish factual
innocence include credible declarations of guilt by another, see
Sawyer v. Whitley, 505 U.S. 333, 340... (1992), trustworthy
eyewitness accounts, see Schlup, 513 U.S. [at 324]... and
exculpatory scientific evidence."

Pitts v. Norris, 85 F.3d 348, 350-51 (8th Cir.), cert. denied, 519 U.S. 972 (1996).  For
purposes of showing actual innocence, "'evidence is new only if it was not available at trial and
could not have been discovered earlier through the exercise of due diligence.'" Johnson v.
Norris, 170 F.3d 816, 817 (8th Cir. 1999), quoting Armine v. Bowersox, 128 F.3d 1222, 1230
(8th Cir. 1997) (en banc), cert. denied, 523 U.S. 1123 (1998).

### (i) Failure to call prospective witnesses

Petitioner first claims that he was deprived of effective assistance of counsel at trial because his attorney did not present the testimony of three prospective witnesses – Tanish Bullock, Deanna Borske and Victor Fields.  This claim was not fairly presented to the Minnesota Supreme Court, because Petitioner never even mentioned the names of any of these witnesses in his brief in support of his direct state court appeal.

Petitioner's state court brief vaguely alluded to certain unnamed witnesses that allegedly could have provided exculpatory evidence, and he asserted that his attorneys "were well aware of those witnesses and the testimony they could provide."  While it is possible that Petitioner was thinking about Bullock, Borske and Fields when he presented that conclusory claim, he certainly did not fairly apprise the Minnesota Supreme Court of what he had in mind.  The State Court had no way of assessing whether Petitioner's counsel should have called Bullock, Borske and Fields to testify at his trial, because he did not identify those witnesses, he did not describe what those witnesses purportedly would have told the jury, and he did not explain why he believed their testimony would have changed the outcome of the trial.  Because Petitioner did not fairly present his first ineffective assistance of counsel claim to the Minnesota Supreme Court, that claim has been procedurally defaulted here.

### (ii) Failure to call expert rebuttal witnesses

In his second habeas corpus claim, Petitioner contends that he received ineffective assistance of counsel, because his attorney failed to call expert witnesses to rebut the prosecution's blood and fingerprint evidence, and to "test potential exculpatory evidence."  This claim has also been procedurally defaulted, because it too was not fairly presented in

12

Petitioner's brief to the Minnesota Supreme Court.

In his state court brief, Petitioner vaguely claimed that his attorney violated his "constitutional right to compulsory process to obtain witnesses in his favor," and that his attorneys were "well aware of these witnesses and how vital they were to [Petitioner's] defense." When Petitioner made that claim, he may have been thinking about some particular expert witness, but he did not identify any such witnesses by name, he did not indicate what those witnesses supposedly would have said at trial, and he did not explain why their expected testimony allegedly was "vital" to his defense. Therefore, the Court finds that Petitioner did not fairly present his second ground for relief, (i.e., his "failure to call expert witness(es)" claim), to the Minnesota Supreme Court, which means that claim has also been procedurally defaulted.

### (iii) Failure to adequately cross-examine witnesses

Petitioner's third habeas claim pertains to his trial counsel's cross-examination of certain prosecution witnesses. Petitioner claims that his attorney did not adequately cross-examine six witnesses – Sergeant Erika Christensen, Dana Blount, Paul Melchert, Sergeant Mike Carlson, Ronald Rucker, and another unidentified law enforcement official. Three of those witnesses – Melchert, Carlson and Rucker – were identified in Petitioner's state court brief, and the Minnesota Supreme Court considered the merits of Petitioner's ineffective assistance of counsel claim with regard to the cross-examination of those particular witnesses. Plaintiff's claims pertaining to those witnesses are discussed below. However, the other three witnesses – Christensen, Blount and the unidentified law enforcement official – were not mentioned in Petitioner's state court brief. Therefore, Petitioner has procedurally defaulted the ineffective assistance of counsel claims that are based on the cross-examinations of those

13

three witnesses.

### (iv) Failure to suggest some other potential perpetrator

Petitioner has broadly alleged, in both his state court appeal and his current habeas application, that he received ineffective assistance of counsel at trial because his attorney did not present "evidence suggesting another person committed the crime." This claim was not fairly presented on direct appeal, because Petitioner's brief to the Minnesota Supreme Court does not indicate what specific evidence he believes his attorney should have presented for the purpose of suggesting that another person committed the crime.

Petitioner's state court brief does mention several pieces of evidence that <u>were</u> presented at trial, which – at least in Petitioner's mind – supposedly suggest that someone else might have killed Wendy Bozeman.  This evidence is (1) the presence of unidentifiable fingerprints, palm prints and DNA evidence on one of the plastic bags found in Theodore Wirth Park, (2) the presence of unidentifiable DNA evidence on a plastic pail, and a light switch, and (3) the presence of "unidentified fibers and foreign substances" on the victim's body parts. However, the state court brief does not identify any specific evidence that was <u>not</u> presented at trial, which would have suggested that someone other than Petitioner was the killer. Petitioner procedurally defaulted his 'other perpetrator' claim because he did not tell the State Minnesota Supreme Court what evidence he thinks his attorneys should have presented that would have caused the jury to think that someone else committed the crime.

### (v) Failure to "present a full defense"

The last ineffective assistance of counsel claim raised in Petitioner's state court brief was that his attorney violated his "constitutional right to present a full defense." Petitioner

14

presented this vague claim to the Minnesota Supreme Court without any explanation at all, (a deficiency that is repeated in his current habeas corpus petition). This claim – whatever it may be – certainly was not "fairly presented" to the State Court, because Petitioner did not offer even a clue of what he had in mind when he accused his counsel of failing to "present a full defense." Therefore, this final claim must also be summarily rejected on the grounds of procedural default.

C. Cause and Prejudice

Having determined that all of the above-described claims have been procedurally defaulted, the only remaining issue to consider with regard to those claims is whether Petitioner has shown cause and prejudice, or actual innocence, to excuse his procedural default. Petitioner has made no effort to satisfy either the cause and prejudice standard or the actual innocence standard, and the Court cannot independently discern any legally acceptable excuse for his procedural default.

In order to satisfy the "cause" requirement, a prisoner must show that some external impediment prevented him from presenting his claims to the state's highest court in a timely and procedurally proper manner. Coleman, 501 U.S. at 753 ("'cause' under the cause and prejudice test is something external to the petitioner, something that cannot fairly be attributed to him... [f]or example, 'a showing that the factual or legal basis for a claim was not reasonably available... or that some interference by officials made compliance impracticable'"), (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)) (emphasis in the original). In this case, Petitioner has not identified any "external cause" for his failure to fairly present his defaulted claims on

direct appeal.[4]

Furthermore, Petitioner does not qualify for the "actual innocence" exception, because he has offered no new evidence to affirmatively demonstrate that he did not commit the crime for which he was convicted. Petitioner's current claims for relief pertain to errors that allegedly occurred during his trial, which purportedly affected the fairness of his prosecution and trial. He has not cited any new evidence, undiscoverable at the time of his trial, which would affirmatively prove that he must, in fact, be innocent of the crime for which he was convicted. Therefore, Petitioner's procedural default of the claims discussed above cannot be overcome by way of the actual innocence exception.

## V.  PETITIONER'S REMAINING (NON-DEFAULTED) CLAIMS

A.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prescribes the standards that govern this Court's substantive review of Petitioner's non-defaulted habeas corpus claims. The relevant portion of the AEDPA, 28 U.S.C. § 2254(d), provides that:

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[4] Because Petitioner has clearly failed to satisfy the cause component of the cause and prejudice requirement, it is unnecessary to discuss the prejudice component. Ashker v. Class, 152 F.3d 863, 871 (8th Cir. 1998) (when petitioner "has not shown adequate cause to overcome the procedural bar... we need not consider the issue of actual prejudice"); Sweet v. Delo, 125 F.3d 1144, 1151 (8th Cir. 1997), cert. denied, 523 U.S. 1010 (1998) (same).

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In Williams v. Taylor, 529 U.S. 362 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district courts. The Supreme Court recognized that

"a state-court decision can be 'contrary to' this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."

Id. at 405.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

Id. at 413.

The Court also explained that

"A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.... [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

Id. at 409, 411 (emphasis added).

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In other words,

17

habeas relief can be granted if the conviction is based on findings of fact that could not reasonably be derived from the state court evidentiary record.  When reviewing a state court decision, however, "a federal court... presumes that the state court's factual determinations are correct," and that presumption "may be rebutted only by clear and convincing evidence."  Lee v. Gammon, 222 F.3d 441, 442 (8th Cir. 2000).

Needless to say, a federal district court is not allowed to conduct its own de novo review of a prisoner's constitutional claims.  Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts.  Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in Williams.

B.  Review of Petitioner's Non-Defaulted Ineffective Assistance Claims

The only claims of ineffective assistance of counsel that Petitioner fairly presented to the Minnesota Supreme Court, and therefore properly preserved for federal habeas corpus review, are (1) that defense counsel did not adequately cross-examine prosecution witnesses Paul Melchert, Sergeant Mike Carlson, and Ronald Rucker, and (2) that defense counsel had a "conflict of interest," by reason of his prior representation of Ronald Rucker.  These claims were addressed on the merits by the State Supreme Court, and that Court's decision on those claims is subject to habeas corpus review in accordance with the standards discussed above.

On Petitioner's direct appeal, the Minnesota Supreme Court correctly recognized that a party who claims "'that he or she received ineffective assistance of counsel must demonstrate that counsel's representation fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for

counsel's errors.'" Miller, 666 N.W.2d at 716, quoting State v. Lahue, 585 N.W.2d 785, 789 (Minn.1998). The State Court further recognized that (i) a prisoner claiming ineffective assistance of counsel "bears the burden of proof on an ineffective assistance of counsel claim;" (ii) "[t]here is a strong presumption 'that counsel's performance fell within a wide range of reasonable assistance;" and (iii) "'[c]ounsel's decisions regarding trial strategy are granted particular deference.'" Id., quoting Lahue, 585 N.W.2d at 789.   Finally, the State Court specifically pointed out that "[w]hich witnesses to call at trial and what information to present to the jury are questions that lie within the proper discretion of the trial counsel.'" Id. quoting Lahue, 585 N.W.2d at 789-90 (quoting State v. Jones, 392 N.W.2d 224, 236 (Minn.1986)). This recitation of the relevant law is fully consistent with the two-prong test prescribed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

The State Court's recitation of the Strickland criteria shows that the proper legal standards were applied to Petitioner's ineffective assistance of counsel claims. See Williams, 529 U.S. at 406 (when a state court applies a Strickland analysis to an ineffective assistance claim, the court has acted in accordance with -- not contrary to -- established federal law). Therefore, the only issue to be resolved here is whether Petitioner has demonstrated that the Minnesota Supreme Court's ruling on his ineffective assistance claims involves an "unreasonable application of clearly established Federal law" to the facts of his case.   28 U.S.C. § 2254(d)(1).  See Williams, 529 U.S. at 417 (Rehnquist, C.J., concurring in part and dissenting in part) ("[g]enerally, in an ineffective-assistance-of-counsel case where the state court applies Strickland, federal habeas courts can proceed directly to 'unreasonable application' review").

### (i) The cross-examination claims

The Minnesota Supreme Court held that defense counsel's cross-examination of witnesses Melchert, Carlson and Rucker was not constitutionally deficient. The State Court pointed out that Petitioner's cross-examination claims simply challenged the trial tactics employed by his attorneys, and that such challenges are normally not sustainable. Miller, 666 N.W.2d at 717 ("'trial tactics should not be reviewed by an appellate court, which, unlike the counsel, has the benefit of hindsight'"), quoting State v. Jones, 392 N.W.2d 224, 236 (Minn. 1986). Petitioner contends that this treatment of his ineffective assistance claim is an unreasonable application of Strickland. The Court disagrees.

The Eighth Circuit Court of Appeals has frequently applied the Strickland competence standard just as the Minnesota Supreme Court did in Petitioner's case. Addressing an ineffective assistance of counsel claim in Schumacher v. Hopkins, 83 F.3d 1034, 1036 (8th Cir. 1996), the Court said "we must defer to counsel's strategic decisions and must not succumb to the temptation to be Monday morning quarterbacks." In Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997), cert. denied, 522 U.S. 1129 (1998), the Court of Appeals said that an ineffective assistance claim based on an allegedly deficient cross-examination "is not the type of error, if indeed it was error at all, that the Sixth Amendment functions to correct." The Court explained that

> "The cross-examination of a witness is a delicate task; what works for one lawyer may not be successful for another. Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel.... [Citation omitted.] We have recently observed that 'there are a few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would past [sic] muster.'"

Id., quoting <u>Willis v. United States</u>, 87 F.3d 1004, 1006 (8th Cir. 1996). <u>See</u> <u>also</u> <u>Johns v.</u>
<u>Bowersox</u>, 203 F.3d 538, 546 (8th Cir.) ("[s]trategic decisions made after diligent investigation
are 'virtually unchallengeable'"), <u>cert</u>. <u>denied</u>, 531 U.S. 1038 (2000), quoting <u>Strickland</u>, 466
U.S. at 690.

The Court finds that the Eighth Circuit has repeatedly applied the <u>Strickland</u>
competence standard to "trial tactic" claims in just the way that the Minnesota Supreme Court
did in Petitioner's case.  Therefore, the State Court's application of the competence standard
is <u>not</u> found to be objectively unreasonable.

Turning to <u>Strickland</u>'s prejudice requirement, the State Supreme Court found that "even
if counsel's performance was deficient" with regard to the cross-examination of Melchert,
Carlson and Rucker, Petitioner "failed to carry his burden of demonstrating that the
representation resulted in prejudice." <u>Miller</u>, 666 N.W.2d at 717.  Petitioner has failed to show
that this conclusion is based on an objectively unreasonable application of <u>Strickland</u>.

Indeed, Petitioner has made no effort to prove that the allegedly deficient cross-
examination of Melchert, Carlson and Rucker probably changed the outcome of his trial. <u>See</u>
<u>Schumacher</u>, 83 F.3d at 1037 ('[a] necessary condition for establishing prejudice is to show
that there is a reasonable probability that but for counsel's unprofessional errors, the result of
the proceeding would have been different").  Given the strength of the prosecution's evidence,
there is no reason to think that Petitioner could have satisfied the prejudice requirement had
he tried.  As Petitioner's counsel correctly recognized, the outcome of Petitioner's trial hinged
on whether the jury would accept the prosecution's DNA evidence.  That evidence showed that
the victim's blood was shed in Petitioner's home and car.  In light of such evidence, defense

counsel's allegedly inadequate cross-examination of Melchert, Carlson, and Rucker appears to be virtually inconsequential.  It certainly cannot be said that the outcome of the trial probably was altered by counsel's failure to question Melchert's recollection of the door on Petitioner's car, or Carlson's discovery of additional blood evidence, or Rucker's past relationship with the victim.  Thus, as the Court of Appeals said in <u>Siers v. Weber</u>, 259 F.3d 969, 975 (8th Cir. 2001), <u>cert</u>. <u>denied</u>, 534 U.S. 1138 (2002), the State Court's "conclusion that there was no prejudice" resulting from counsel's alleged errors is "sufficiently reasonable to be entitled to deference under AEDPA."

### (ii) The conflict of interest claim

In his final claim, Petitioner alleges that his defense counsel had a "conflict of interest" because he had represented Ronald Rucker in a "previous legal matter."  As a result of that alleged conflict, Petitioner claims, the attorney did not ask Rucker enough tough questions about his past – allegedly turbulent – relationship with Wendy Bozeman.[5]

Petitioner has not clearly explained, either in the state courts or here, why his "conflict of interest" claim should be analyzed differently from his <u>Strickland</u>-based claim regarding the alleged inadequacy of Rucker's cross-examination, (discussed above).  However, the Minnesota Supreme Court considered the conflict of interest claim separately from Petitioner's

---

[5]  In his "Notice of Appeal," (Docket No. 15), Petitioner alleges the following:

"Through the motion of discovery, Petitioner received documents showing the violent relationship between Rucker and Bozeman throughout the years.  She filed numerous order[s] of protection against him.  On some occasions, he would beat her severely, on others, he would make verbal threats, one order of protection in particular filed against him, she reportedly told authorities that he had threatened to 'kill her.'  Mr. Rucker also had a lengthy arrest record for using and selling cocaine."

other ineffective assistance of counsel claims, and this Court will as well.

The Court recognizes, (and the Minnesota Supreme Court presumably did too), that a conflict of interest allegation can give rise to special concerns about the adequacy of a criminal defendant's legal representation. The Eighth Circuit Court of Appeals has pointed out that

> "there are three classes of ineffective-assistance claims, described in Strickland, in which we presume prejudice rather than require a defendant to demonstrate it.... [Citation omitted.] One such class encompasses ineffective-assistance claims where counsel labored under an actual conflict of interest.... [Citation omitted.] In Cuyler v. Sullivan [446 U.S. 335 (1980)], the Supreme Court held that if a defendant who raised no objection at trial can show 'an actual conflict of interest [that] adversely affected his lawyer's performance,' prejudice may be presumed."

Covey v. United States, 377 F.3d 903, 906-07 (8th Cir. 2004), quoting Cuyler, 446 U.S. at 348 (emphasis added). In other words, if Petitioner could show that his attorney had the type of conflict of interest that was contemplated in Cuyler, then he could sustain an ineffective assistance of counsel claim, without specifically satisfying the normal Strickland prejudice requirement. See Cuyler, 335 U.S. at 349-50 ("a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief"). This variance from the usual Strickland requirements presumably explains why Petitioner brought his conflict of interest claim as a separate and distinct ground for relief, and why the Minnesota Supreme Court treated it as such.

Petitioner is not entitled to relief based on Cuyler, however, because his conflict of interest claim is distinguishable from the type of conflict on which the Cuyler rule is predicated. In Cuyler, the Supreme Court considered a particularly pernicious form of conflict of interest – namely, a conflict resulting from a single lawyer's joint representation of multiple defendants

accused of a common crime.  The Court later pointed out that not all conflicts of interest are the same, and that the Court has never extended <u>Cuyler</u>'s 'no prejudice required' rule to cases involving conflicts other than those resulting from joint representation.  <u>Mickens v. Taylor</u>, 535 U.S. 162, 174-75 (2002).  As the Court of Appeals pointed out in <u>Covey</u>, 337 F.3d at 907, in <u>Mickens</u>, "[t]he Court made clear... that it had never extended the <u>Cuyler</u> standard to conflicts other than those arising from joint representation at trial."

The Supreme Court's discussion of <u>Cuyler</u> in <u>Mickens</u>, emphasizing that <u>Cuyler</u> has not been extended beyond joint representation conflicts, vitiates Petitioner's current conflict of interest claim.  Petitioner does not allege a joint representation conflict; he contends only that his attorney represented a prosecution witness, (not a co-defendant), in a <u>previous</u> legal matter.  Because Petitioner is raising a conflict claim based on <u>successive</u> representation, rather than joint representation, his claim is not covered by <u>Cuyler</u>.  <u>Mickens</u>, 535 U.S. at 176.

According to the Sixth Circuit Court of Appeals, "[i]n the wake of <u>Mickens</u>, no court has applied the [<u>Cuyler v.] Sullivan</u> presumption [of prejudice] to a case of successive representation."  <u>Moss v. United States</u>, 323 F.3d 445, 460 (6th Cir.), <u>cert</u>. <u>denied</u>, 540 U.S. 879 (2003).  In a later case, the same Court flatly held that "[t]he presumed prejudice standard for ineffectiveness claims based on a conflict of interest detailed in <u>Cuyler v. Sullivan</u>... is inapplicable to cases of successive representations."  <u>Lordi v. Ishee</u>, 384 F.3d 189, 193 (6th Cir. 2004).  <u>See</u> <u>also</u> <u>Benge v. Johnson</u>, 312 F.Supp.2d 978, 994 (S.D.Ohio 2004) (holding that <u>Cuyler</u>'s presumed prejudice standard cannot be applied in cases of alleged conflict that do not involve joint representation).

Because the United States Supreme Court has not extended <u>Cuyler</u>'s presumed

prejudice rule beyond joint representation conflicts – and, in fact, the Court has suggested that

such an extension would appear to be unwarranted – the Minnesota Supreme Court cannot be

faulted for not applying that rule to Petitioner's conflict of interest claim.  It follows that Petitioner

cannot be granted a writ of habeas corpus on that claim here.  As the Tenth Circuit Court of

Appeals has explained:

> "The Supreme Court... has never extended the Cuyler standard to cases
> involving successive, rather than multiple, representation.... [Citation omitted.]
> There is, therefore, no 'clearly established federal law, as determined by
> Supreme Court of the United States' mandating reversal of a conviction on a
> mere showing of a conflict of interest involving successive representation that
> adversely affected the attorney's representation of his client."

Montoya v. Lytle, 53 Fed.Appx. 496, 498 (10th Cir. 2002) (unpublished decision), cert. denied,

538 U.S. 1042 (2003).  This reasoning is directly applicable here.

Because Petitioner is not entitled to the benefit of Cuyler's presumed prejudice rule, his

conflict of interest claim, pertaining to Rucker's cross-examination, must be evaluated under

the normal Strickland standards.  See Lordi, 384 F.3d at 193 (Strickland "is the controlling

authority for an ineffectiveness claim based on a conflict of interest for a successive

representation"); Benge 312 F.Supp.2d at 994 (because "the conflict of interest alleged by

petitioner is not one involving joint representation... petitioner is not entitled to the lessened

standard of proof set forth in Cuyler v. Sullivan, and must instead demonstrate under Strickland

that defense counsel, due to the alleged conflict of interest... performed deficiently and to

petitioner's prejudice").  The Court has already determined that the Minnesota Supreme

Court's resolution of the Rucker cross-examination claim did not involve an objectively

unreasonable application of the Strickland standards.  (See pp. 20-22, supra.)  Therefore,

Petitioner's final ineffective assistance of counsel claim, based on the alleged conflict of interest resulting from counsel's successive representation of Rucker and Petitioner, must also be denied.

## VI. CONCLUSION

For the reasons discussed above, the Court concludes that Petitioner cannot be granted a writ of habeas corpus on any of the claims he has presented in this case.  It will therefore be recommended that his habeas petition be denied, and that this action be dismissed with prejudice.

## VII. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.  Petitioner's Motion to Appoint Counsel (Docket No. 13) be DENIED as moot;

2.  Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254, (Docket No. 1), be DENIED; and

3.  This action be DISMISSED WITH PREJUDICE.


Dated: May 3, 2005

                                s/ Susan Richard Nelson
                               SUSAN RICHARD NELSON
                               United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this report and recommendation by filing with the Clerk of Court and serving all parties, by May 18, 2005, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief with ten days after service thereof.  All briefs filed under this rule shall be limited to ten pages.  A judge shall make a de novo determination

of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.